IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
ROBERT JOSEPH PODZEMNY and
7-H CATTLE FEEDERS, INC.,           Jointly administered under
                                     Case No. 09-14226-j11
        Debtors.

## MEMORANDUM OPINION

The matter came before the Court on January 31, 2011 on Robert J. Podzemny's Supplemental Motion for Order Authorizing Use of Cash Collateral for the 2011 Grazing Cattle and Corn Crop (the "Supplemental CC Motion")(Docket No. 394), filed January 13, 2011. Counsel appeared as noted on the record. The Court has considered the evidence and argument of counsel, and has determined that the Supplemental CC Motion should be granted with certain conditions as set forth below.

## SUMMARY OF THE PARTIES' POSITIONS

The Debtor Robert J. Podzemny (the "Debtor") requests authorization for use of over $12 million in cash collateral as follows:  1) up to $800,000[1] to develop an additional 750 acres of farmland on the Mock Farm that includes installation of an irrigation system on that acreage; 2) approximately $4.5 million to plant, cultivate and harvest a 2011 corn crop on approximately 7,170 acres, including the newly developed acreage; 3) approximately $6 million of cash collateral to acquire up to 9,000 head of wheat cattle in February, March and April of 2011; and 4) approximately $1.2 million to acquire up to 2,000 head of cattle to graze on grass pasture. The Debtor also seeks use of cash collateral to graze and care for the newly acquired cattle.

Great Plains Ag Credit, P.C.A and Great Plains Ag Credit, F.L.C.A. (collectively, "GPAC") objects to use of cash collateral to develop 750 acres of land and expand farming operations on

---

[1] The Supplemental CC Motion requests an estimated $950,000 to develop the irrigation system for the Mock Farm. Though testimony offered at the final hearing on the Supplemental CC Motion, this figure was reduced to $800,000.

the Mock Farm. GPAC asserts that expansion of the Mock Farm is outside the ordinary course of the Debtor's business, should not be permitted on fourteen days' notice with minimal disclosure, and that development of the Mock Farm is the first step of a *sub rosa* plan. GPAC further objects to the Debtor acquiring more than 4,500 head of wheat pasture cattle in the first half of 2011 because it is concerned that if the conditions in 2011 are dry, there is too great a risk that the wheat pasture will not support more than 4,500 head of cattle, particularly in view of the water needed to grow the corn crop. GPAC further argues that the Debtor's proposed use of cash collateral would not leave GPAC adequately protected. GPAC believes that the Debtor's plan of reorganization fails to reduce his operations to a more manageable and realistic level in light of the Debtor's age, and urges that the Debtor should be required to rein in his operations and use available cash to pay down debt.

Subject to adequate protection consistent with prior cash collateral orders in this case, and additional adequate protection payments, GPAC consents to the Debtor's use of cash collateral to plant, cultivate and harvest a corn crop on the Debtor's existing irrigated farmland and to the use of cash collateral for the Debtor to acquire, graze and care for up to 4,500 head of wheat pasture cattle and up to 2,000 head of grass pasture cattle.

The Official Committee of Unsecured Creditors ("UCC") supports the Debtor's request to use cash collateral to purchase additional cattle at the levels he requests, but objects to the Debtor's request to use cash collateral to develop the Mock Farm and grow a corn crop on 750 acres of the Mock Farm in 2011 because of its concern that the Mock Farm cannot be developed in time to plant a corn crop for 2011. Dalhart Consumers Fuel Association, Inc. ("Dalhart"), a holder of an unsecured nonpriority claim in the amount of $878,893.95, objects to expenditures to develop and farm the Mock Farm on the ground that it would put at risk the distributions to be made to Dalhart under the Debtor's proposed plan of reorganization. Dalhart views the Debtor's request

to develop the Mock Farm as an expansion of the Debtor's business outside his ordinary course of operations.

BACKGROUND AND PROCEDURAL HISTORY

On September 17, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned bankruptcy case. On September 19, 2009, 7-H Cattle Feeders, Inc. ("7-H") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code as Case No. 09-14232-j11. The two cases are now jointly administered under Case No. 09-14226-j11. The Debtor is the sole owner of 7-H. The Debtor continues in the management and possession of his business and property as debtor in possession pursuant to 11 U.S.C. §1107 and 11 U.S.C. § 1108.

The Court has entered at least eight orders authorizing the Debtor to use cash collateral, including the Fourth Cash Collateral Order entered April 8, 2010 (Docket No. 200) (the "Fourth CCO"), the Fifth Cash Collateral Order entered July 21, 2010 (Docket No. 295) (the "Fifth CCO"), the Supplemental Wheat Crop Cash Collateral Order entered September 2, 2010 (Docket No. 305), the Wheat Expense Cash Collateral Order entered September 2, 2010 (Docket No. 326) (the Supplemental Wheat Crop CCO and Wheat Expense CCO are collectively called the "Wheat CCO"), and the Wheat Pasture Cattle Cash Collateral Order entered November 2, 2010 (Docket No. 359) (the "Wheat Pasture Cattle CCO").

GPAC, on the one hand, and Podzemny and 7-H, on the other, have filed competing plans. It is likely that a confirmation hearing on the competing plans will be conducted in the first half of 2011. The GPAC plan is largely a liquidating plan. The Debtor's plan is largely a plan to restructure debt and continue operations.

## FACTS

The Debtor has approximately thirty-eight years of experience farming crops and raising cattle. His farms include the Apache Farm, Mock Farm, Perico Farm and Sedan Farm. The Debtor's current business operations consist primarily of growing corn on approximately 6,400 acres of irrigated land, pasturing cattle on approximately 6,500 acres of wheat, and pasturing cattle on grass.

The Debtor's principal indebtedness consists of approximately $27 million owed to GPAC and approximately $1.5 million owed to holders of unsecured nonpriority claims.[2] The indebtedness to GPAC is secured by liens on all or substantially all of the Debtor's assets. GPAC estimates that the loan to value ratio for its $27 million secured claim is 60% to 70%. The Debtor's expert estimated the loan to value ratio at 52.52%.

The Debtor realized a profit from operations in 2010 in the amount of approximately $3.6 million. Better than normal weather and market conditions in 2010 contributed to the profit. The Debtor currently has over $3 million of cash on hand, approximately 7,500 head of cattle on pasture scheduled to be sold by the end of June 2011, and corn inventory expected to be sold by the end of April 2011.

The Debtor purchased the Perico Farm in 1998 as grassland, and subsequently developed it into an irrigated farm. The Debtor purchased the Mock Farm in 2007 or 2008 as grassland. When he purchased the Mock Farm, he hoped eventually to develop it as irrigated farmland. Other than the Perico Farm and Mock Farm, there is no evidence before the Court that the Debtor has purchased unimproved land for the purpose of developing it into irrigated acreage

---

[2] This estimate of unsecured non-priority claims is based on the testimony of Robert Podzemny at the final hearing on the Supplemental CC Motion, and may include some of the unsecured claims associated with 7-H.

-4-

suitable for farming. The Debtor is in the business of farming crops and growing cattle. He is not in the business of buying and developing farms.

After the Debtor purchased the Mock Farm, the New Mexico State Engineer declared a water basin that included the Mock Farm. The Debtor drilled wells and hired a hydrologist and an attorney specializing in water law to seek a water permit for the Mock Farm. The hydrologist and water rights attorney are Court-approved professionals for the Debtor in the Debtor's chapter 11 case. In January 2011, the New Mexico State Engineer issued a permit for 3,000 acre feet of water per year for the Mock Farm. The Debtor testified that the permit will enable him to develop and farm 1,500 acres on the Mock Farm. He also testified he can use the test wells drilled on the farm to irrigate 750 acres.

The Debtor estimates the cost to develop 750 acres of the Mock Farm as irrigated farmland is approximately $750,000 to $800,000. A cost detail is set forth on Exhibit 2 admitted in evidence at the final hearing. The Debtor based those estimates on telephone quotes he received from vendors. He also testified that subject to meeting with his gas service provider, he believes the Mock Farm can be developed in time to grow corn on the land in 2011, although he may need to plant a faster growing corn variety.

Blake Prather, qualified by the Court as an expert in farming operations, testified that based on the expected yield, corn price, and farming costs for growing corn on 750 acres of the Mock Farm, the projected profit for the corn crop on the Mock Farm for the 2011 corn crop is $426,250.

The Mock Farm has no track record to support predictions of crop productivity. No agronomic work has been conducted to test the soil or estimate corn yields on the Mock Farm. There are certain risks inherent in farming, such as market conditions, hail damage and other

-5-

Case 09-14226-j11    Doc 409    Filed 02/08/11    Entered 02/08/11 16:56:24 Page 5 of 19

suitable for farming. The Debtor is in the business of farming crops and growing cattle. He is not in the business of buying and developing farms.

After the Debtor purchased the Mock Farm, the New Mexico State Engineer declared a water basin that included the Mock Farm. The Debtor drilled wells and hired a hydrologist and an attorney specializing in water law to seek a water permit for the Mock Farm. The hydrologist and water rights attorney are Court-approved professionals for the Debtor in the Debtor's chapter 11 case. In January 2011, the New Mexico State Engineer issued a permit for 3,000 acre feet of water per year for the Mock Farm. The Debtor testified that the permit will enable him to develop and farm 1,500 acres on the Mock Farm. He also testified he can use the test wells drilled on the farm to irrigate 750 acres.

The Debtor estimates the cost to develop 750 acres of the Mock Farm as irrigated farmland is approximately $750,000 to $800,000. A cost detail is set forth on Exhibit 2 admitted in evidence at the final hearing. The Debtor based those estimates on telephone quotes he received from vendors. He also testified that subject to meeting with his gas service provider, he believes the Mock Farm can be developed in time to grow corn on the land in 2011, although he may need to plant a faster growing corn variety.

Blake Prather, qualified by the Court as an expert in farming operations, testified that based on the expected yield, corn price, and farming costs for growing corn on 750 acres of the Mock Farm, the projected profit for the corn crop on the Mock Farm for the 2011 corn crop is $426,250.

The Mock Farm has no track record to support predictions of crop productivity. No agronomic work has been conducted to test the soil or estimate corn yields on the Mock Farm. There are certain risks inherent in farming, such as market conditions, hail damage and other

weather conditions that affect productivity and costs. The likelihood that the Debtor will realize close to his projected profit of $426,250 by farming 750 acres of the Mock Farm in 2011 is uncertain.

The Debtor requests authority to use of cash collateral to acquire up to 9,000 head of cattle to graze on wheat pasture and up to 2,000 head of cattle to graze on grass pasture. In the first half of 2010, the Debtor pastured cattle in numbers generally consistent with the number of cattle he wishes to acquire for grazing in the first half of 2011. The Debtor's historical death loss on his cattle is consistent with industry averages.

To mitigate market risk, the Debtor has agreed have price protection in place for cattle he acquires and the corn he grows in 2011, consistent with price protection in place for cattle acquired and corn grown in 2010. The Debtor also agreed that his cattle raised in 2011 will be sold as feeder cattle, and that he will not feed the cattle at a feedlot either individually or through 7-H.

In the Debtor' business judgment, his profitability in 2011 will be substantially higher if he is permitted to acquire the additional cattle he seeks to acquire in the first half 2011 and to develop and farm the Mock Farm in 2011. The Debtor believes he has sufficient water to grow the corn, including the corn he plans to grow on the Mock Farm, and to pasture up to 9,000 head of cattle on wheat in the first half of 2011, taking into account his permitted water supplemented by anticipated precipitation.

GPAC's expert testified that, in his estimation, the Debtor will have sufficient water to grow the corn and to pasture only approximately 4,500 head of cattle on wheat in the first half of 2011 if it turns out that conditions are very dry. No reasonable prediction can be made at this time whether 2011 will turn out to be a drought year or a particularly wet year, or something in

between, in the area where the Debtor farms and grows cattle. Historically, the Debtor has never used his entire water allotment for his wheat pasture and farmland. No evidence was presented regarding whether or to what extent there are unpaid administrative expenses in this case.

## DISCUSSION

Use of cash collateral is governed by 11 U.S.C. § 363 which provides, in relevant part:

The trustee[3] may not use, sell or lease cash collateral . . . unless –
    (A) each entity that has an interest in such cash collateral consents; or
    (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Section 363 further provides that, at the request of a secured creditor, the Court "shall prohibit or condition such use [of cash collateral] . . . as is necessary to provide adequate protection" of the secured creditor's interest. 11 U.S.C. § 363(e). Section 361, in turn, gives examples of the types of adequate protection that may be provided under 11 U.S.C. § 363.[4]

A debtor will generally be permitted to use cash collateral if the creditor's interest in cash collateral is adequately protected.[5] "[C]ourts have considered 'adequate protection' a concept

---

[3] A debtor in possession has the powers of a trustee. *See* 11 U.S.C. §1107.

[4] Section 361 provides, in relevant part:
    When adequate protection is required under section . . . 363. . . of this title of an interest of an entity in property, such adequate protection may be provided by –
        (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that . . . use sale or lease under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property;
        (2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
        (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.
11 U.S.C. § 361.

[5] *See MBank Dallas, N.A., v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir.1987) ("The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy."); *In re Amaravathi Ltd. P'ship*, 416 B.R. 618, 624 (Bankr.S.D.Tex. 2009)("Section 363 mandates that a trustee or a debtor-in-possession provide adequate protection before the rents can be utilized by the estate.").

which is to be decided flexibly on the proverbial 'case-by-case' basis."[6] The party requesting court approval to use cash collateral over a secured creditor's objection must prove there is adequate protection for that creditor.[7] An equity cushion can serve as adequate protection for purposes of 11 U.S.C. § 363.[8]

### A. Use of Cash Collateral To Plant 2011 Corn Crop on Existing Farmland

GPAC consents to the Debtor's use of cash collateral to plant, cultivate, and harvest corn in 2011 on his existing farmland, excluding the Mock Farm. This portion of the Supplemental CC Motion thus meets the requirements of 11 U.S.C. § 363(c)(2)(1), which authorizes use of cash collateral upon the consent of each entity holding an interest in such cash collateral. The UCC and Dalhart likewise support this effort. As further outlined below, all cash collateral that the Debtor is authorized to use will continue to be subject to the restrictions imposed by prior cash collateral orders, including periodic payments to GPAC.

### B. Use of Cash Collateral to Purchase Up to 9,000 Head of Cattle in 2011

GPAC argues that pasturing up to 9,000 head of cattle on wheat is not within the scope of reasonable business judgment and would not leave GPAC adequately protected with respect to its security interest in cash collateral and other assets. GPAC asserts that in a year in which conditions are dry there is substantial risk that the Debtor's available wheat pasture will not

---

[6] *MBank Dallas,* 808 F.2d at 1396-1397 (citing *In re Martin,* 761 F.2d 472 (8th Cir. 1985)(remaining citation omitted)).
[7] 11 U.S.C. § 363(p)(1)(providing that "the trustee [or the debtor in possession with the powers of a trustee] has the burden of proof on the issue of adequate protection"); *In re Carbone Companies, Inc.*, 395 B.R. 631, 635 (Bankr.N.D.Ohio 2008)(stating that, "[a] debtor requesting court approval to use cash collateral has the burden of proof as to the issue of 'adequate protection.'").
[8] *Baybank-Middlesex v. Ralar Distributors, Inc.,* 69 F.3d 1200, 1203 (1st Cir. 1995)(noting that "[a] sufficient equity cushion is itself a recognized form of adequate protection . . ."); *In re Shubh Hotels Pittsburgh, LLC,* 439 B.R. 637, 646 (Bankr. W.D.Pa. 2010)(finding that the lender was adequately protected by the equity cushion and the debtor's willingness to make periodic interest payments); *In re Las Torres Dev., L.L.C.,* 413 B.R. 687, 697 (Bankr. S.D.Tex. 2009)(finding that an equity cushion of more than 20% constituted sufficient adequate protection). *See also Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel Corp.),* 159 B.R. 165, 169 (Bankr.W.D.Pa. 1993)(acknowledging that the existence of an equity cushion can alone constitute adequate protection for debtor's use of cash collateral, but stating that where the size of the equity cushion is insufficient, or likely to erode, it is not sufficient standing alone to constitute adequate protection).

-8-

support more than 4,500 head of additional wheat cattle, particularly in view of the water usage needed to grow the corn crop. GPAC further objects because the Debtor's proposed use of cash collateral to purchase cattle does not obligate the Debtor to sell the cattle as feeder cattle by a date certain, does not prohibit the Debtor from feeding the cattle in a feedlot, and does not require the Debtor to implement appropriate price protection on all cattle despite today's "frothy" cattle market. GPAC presented no evidence and did not cross examine the Debtor or his consultant in support of its contention that high cattle prices or other market conditions indicate that prudent risk management should include implementation of appropriate price protection for all cattle.

The Court finds, in the circumstances of this case and subject to certain conditions set forth below, that GPAC's interest in cash collateral is adequately protected with respect to the Debtor's purchase up to 9,000 head of cattle for grazing on wheat pasture and up to 2,000 head of cattle for grazing on grass, and such cattle purchases are within the Debtor's sound business judgment. The Debtor's consultant testified that the Debtor has sufficient water to graze up to 9,000 head of cattle on wheat pasture and irrigate the corn crop as needed. He also testified that the Debtor has not used his entire permitted water in the past. Although the Debtor did not present evidence in support of this conclusory testimony regarding the amount of his permitted water, the amount of permitted water used in past years to grow his corn crop or graze cattle on wheat, and whether and to what extent he has stocked the pastures with more or less cattle as a result of variations in weather conditions, the unrefuted testimony is that the Debtor has never in the past run out of water, even in a dry year.

Further, in view of the cattle purchases being consistent with the number of cattle purchased in 2010, the Debtor's profitability in 2010, the extent of GPAC's security cushion, and

Case 09-14226-j11    Doc 409    Filed 02/08/11    Entered 02/08/11 16:56:24 Page 9 of 19

the amount of the Debtor's other pre-petition indebtedness, the Court will afford the Debtor more latitude in the exercise of his business judgment. These same factors support the Court's finding that GPAC's interest in collateral is adequately protected. GPAC's concerns about the Debtor being obligated to sell the cattle as feeder cattle by a date certain, being prohibited from feeding the cattle in a feedlot, and being required to implement price protection on cattle are addressed in the conditions that will be imposed on the use of cash collateral. The Court, therefore, will authorize use of up to $6 million of cash collateral to acquire cattle as requested, subject to further conditions as outlined below.

### C. Use of Cash Collateral to Develop Mock Farm

The Debtor did not by the Supplemental CC Motion, or otherwise, specifically request authority under 11 U.S.C. § 363(b)(1)[9] to engage in a transaction outside the ordinary course of business, though, as discussed below, the Debtor's request to develop the Mock Farm constitutes the use property of the estate other than in the ordinary course of business, within the meaning of 11 U.S.C. § 362(b)(1). The Bankruptcy Code does not define "ordinary course of business" for purposes of 11 U.S.C. § 363(b)(1).[10] In evaluating whether a debtor's proposed business transaction falls within the ordinary course of the debtor's business, courts generally employ two tests: 1) a "horizontal test" which considers whether the transaction, from an industry-wide perspective, is of the typed commonly undertaken by companies in that industry; and 2) a "vertical test" which considers the reasonable expectations of a hypothetical creditor and whether the proposed business subjects such creditor to economic risks that differ from the risks the

---

[9] 11 U.S.C. §363(b)(1) provides, in relevant part:
    The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .
    11U.S.C. § 363(b)(1).
[10] *See In re Git-N-Go, Inc.,* 322 B.R. 164, 171 (Bankr. N.D.Okla. 2004)(noting that "[t]he Bankruptcy Code does not define the term 'ordinary course of business.'").

Case 09-14226-j11    Doc 409    Filed 02/08/11    Entered 02/08/11 16:56:24    Page 10 of 19

creditor accepted when first extending credit to the debtor.[11] "The purpose of both tests is to determine whether a transaction is so out of the ordinary as to entitle creditors to notice and a hearing beforehand."[12] Both tests must be satisfied in order for a transaction to be within the ordinary course of business.[13]

The evidence before the Court is that the Debtor purchased and developed one of his four farms, the Perico Farm, in 1998. The Debtor has not farmed the Mock Farm. He has only recently obtained a water permit for the farm, and now seeks to develop the farm by installing an irrigation system so he can grow crops on the farm. The Debtor is in the business of growing cattle and farming crops. He is not in the business of acquiring and developing farms. His acquisition and development of a farm is an infrequent event. Nor is there any evidence that a farmer and rancher in the business of growing crops and cattle for sale ordinarily and regularly develops new farmland. The Court finds, whether viewed under the vertical test or the horizontal test, that the transaction is so out of the ordinary as to entitle creditors to notice and a hearing beforehand, and consequently, concludes that the development of the Mock Farm is outside the Debtor's ordinary course of business.

---

[11] *In re Straightline Investments, Inc.*, 525 F.3d 870, 879 (9th Cir. 2008)(stating that "[t]wo tests have emerged for determining whether a transaction is within the ordinary course of business for purposes of § 363(c)-the vertical dimension, or creditor's expectation, test, and the horizontal dimension test.")(citations omitted); *Braunstein v. McCabe*, 571 F.3d 108 , 124 (1st Cir. 2009)(same); *Medical Malpractices Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir. 1997)(same); *In re Roth American, Inc.*, 975 F.2d 949, 952-953 (3rd Cir. 1992)(same).
[12] *Braunstein,* 571 F.3d at 124 (citing *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 705 (9th Cir. 1988)).
[13] *In re First Protection, Inc.*, 440 B.R. 821, 833 (9th Cir.BAP 2010). *See also, In re Enron Corp.* 2003 WL 1562202, *16 (Bankr. S.D.N.Y 2003)(stating that the "tests are intended to be both expansive and flexible and both elements of this inquiry must be satisfied in order for a transaction to be within the ordinary course of business."); *Streetman v. United States*, 187 B.R. 287, 292 (W.D.Ark.1995)(noting that "a transaction must satisfy both tests in order to be considered in the ordinary course of business.")(citations omitted).

(a) <u>The Notice Given of the Request to Develop the Mock Farm was Sufficient</u>

A debtor in possession may use property of the estate consisting of cash collateral other than in the ordinary course of business "after notice and a hearing." 11 U.S.C. § 363(b)(1). "After notice and a hearing" is defined in the Bankruptcy Code as "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). GPAC complains that a hearing on the Debtor's request to develop the Mock Farm on 14 day's notice was not sufficient in the circumstances. This Court disagrees. GPAC is by far the Debtor's largest creditor and has consistently taken an active role in the bankruptcy case. It has negotiated at least eight prior cash collateral orders and is familiar with the Debtor's business. GPAC has filed its own disclosure statement and competing plan of reorganization. Granting the Debtor's requested use of cash collateral will not prejudice GPAC in regard to confirmation of its competing plan. Finally, the Debtor did not obtain the water permit until early 2011 and needs to know whether authority will be granted in time to develop the Mock Farm and plant a corn crop in 2011. Under these circumstances, the Court finds that the notice and hearing in connection with the Supplemental CC Motion was sufficient.

(b) <u>Development of the Mock Farm is within the Scope of the Debtor's Sound Business Judgment</u>

In considering a debtor's request to use estate property outside the ordinary course of business, the Court must determine whether the debtor has sufficiently justified the proposed transaction.[14] This requires a showing of an "articulated business justification" for use of the

---

[14] *See In re ASARCO LLC,* ___ B.R. __, 2010 WL 3452384 , *9 (S.D. Tex. August 20, 2010)(stating that "[a]pproval of § 363(b) transactions requires that the bankruptcy court find that the debtor 'justify[ ] the proposed transaction.'")(quoting *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986)(citing *In re Lionel Corp.* 722 F.2d 1063, 1071 (2nd Cir. 1983)). *See also, In re Friedman's, Inc.* 336 B.R. 891, 895 (Bankr.S.D.Ga. 2005) (stating that

estate property.[15]  In reviewing the Debtor's exercise of its business judgment, the Court considers whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made in good faith, and (5) does not constitute an abuse of discretion or waste of corporate assets.[16]

The Debtor provided an itemized cost estimate to develop the Mock Farm.  He seeks authority to use up to $800,000 for the development which includes a cushion for cost overruns. He testified he had verbal quotes from vendors regarding the purchase and installation of equipment, and met with his electricity provider and has a planned meeting with his natural gas provider, but has no written quotes or commitments from any vendors.  The Debtor views it as "not a problem" to complete the development of the Mock Farm within his $800,000 cost estimate in time to plant corn in 2011 subject to the results of his meeting with the natural gas provider.  The Debtor did not seek or obtain any written price quotes or any written commitments to deliver and install equipment by any particular time.  The Debtor testified that to grow a corn crop in 2011 on the Mock Farm he needs to plant the corn mid-April; 2011, or by mid-May 2011 at the latest if he plants a shorter variety of corn.

The Debtor's consultant, Blake Prather, testified that he estimated corn sale proceeds of $907,500 from the Mock Farm based on 750 acres of planted corn, a yield of 220 bushels per acre, and a sales price of $5.50 per bushel.  His estimated yield was based on the Debtor's 2010 corn yield of 208 bushels per acre on 6400 acres of farmland, an anticipated higher yield on

---

"[c]ourts review a debtor's use of estate property outside of the ordinary course of business pursuant to a debtor's demonstration of sound business judgment.")(citations omitted); *Shubh Hotels,* 439 B.R. at 639 ("Courts have held that in determining whether to authorize a debtor's use, sale or lease of property of the estate under Section 363(b)(1), the debtor-in-possession is required to show that a sound business purpose justifies the debtor's contemplated actions")(citations omitted).

[15]*ASARCO LLC,* 2010 WL 3452384 at *9 (quoting *Continental Airlines,* 780 F.2d at 1226 (citing *Lionel Corp.,* 722 F.2d at 1071).

[16]*In re Adelphia Communications Corp.,* 2004 WL 1634538, *2 (Bankr. S.D.N.Y. June 22, 2004)(unreported).

newly developed land, and corn production figures in Texas panhandle area. No testimony was given concerning how the Debtor's corn yield in 2010 compared with prior years. Mr. Prather estimated direct expenses of $431,250 based on the Debtor's 3-year historical crop production costs and cost estimates for growing corn prepared by Texas A&M. The projected sale proceeds less projected direct costs yields projected net income from corn on Mock Farm of $476,250. No testimony was given whether growing corn at the Mock Farm would increase fixed or indirect costs.

Because no soil testing was performed, and there is no history of yields at the Mock Farm, the production estimate of 220 bushels per acre is subject to more than the ordinary risk associated with projecting production. The Debtor recently obtained a permit to use 3,000 acre feet per year of water at the Mock Farm. However, there was no testimony regarding the amount of irrigated water needed to grow corn on 750 acres at the Mock Farm.

The Court finds that it is within the Debtor's sound business judgment to develop the Mock Farm, provided he can plant the corn in time to grow a crop in 2011 and obtains written quotes and commitments from vendors consistent with his cost and timing estimates and implements adequate price protection for the crop. In the circumstances of this case, where the Debtor made a $3.6 million profit in 2010, the Debtor's principal creditor, GPAC, has a security cushion on its $27 million claim of at least $11.5 million, and the Debtor's remaining pre-petition unsecured non-priority indebtedness is approximately $1.5 million, the Court should afford the Debtor more latitude in the exercise of his business judgment to expend up to $800,000 to develop the Mock Farm. Farming an additional 750 acres in 2011 represents an approximate 12% increase in the Debtor's farmed acreage. Wells are already in place for the irrigation system. The Debtor has operated profitably since commencing this chapter 11 case,

-14-

due in part to good weather and market conditions and corn prices remain relatively high. The Debtor is highly motivated to obtain confirmation of his plan of reorganization, as an alternative to GPAC's proposed liquidating plan, and has made a judgment that such development would not render his plan infeasible.

GPAC also asserts that development of the Mock Farm is the first step of a *sub rosa*[17] plan. The Court disagrees. "Where a transaction has the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited *sub rosa* plan."[18] The *sub rosa* plan concern could be of particular import here because competing plans are on file. However, the proposed use of cash collateral does not specify the terms of a future plan of reorganization.[19] Except for the development of the Mock Farm, the proposed use of cash collateral permits the Debtor to continue to operate in the ordinary course of business. Development of the Mock Farm does not prejudice GPAC with respect to confirmation of its competing liquidating plan. To the contrary, the recent issuance of the water permit and development of the Mock Farm enhances its liquidation value. If the GPAC plan were confirmed, arrangements could be made to complete and harvest the 2011 crop.

---

[17] "Sub rosa" literally means "under the rose" and historically is used to mean "confidential, secret, or not for publication." Black's Law Dictionary 1441 (7th ed. 1999).

[18] *Shubh Hotels,* 439 B.R. at 644 (citations omitted). *See also, Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983)(stating that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."); *In re General Motors Corp,* 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009)(stating that "[a] proposed 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights, such as by placing restrictions on creditors' rights to vote on a plan.")(citations omitted).

[19] *See Shubh Hotels,* 439 B.R. at 644 (noting that the Fifth Circuit has articulated that "a transaction would amount to such a *sub rosa* plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors.")(citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.),* 119 F.3d 349, 354 (5th Cir. 1997)(citing *Braniff,* 700 F.2d at 940)).

Case 09-14226-j11    Doc 409    Filed 02/08/11    Entered 02/08/11 16:56:24 Page 15 of 19

D. <u>Adequate Protection and Additional Conditions on Debtor's Use of Cash Collateral</u>

GPAC has an equity cushion of at least 30% on the estimated outstanding loan balance of $27 million. This security cushion, when combined with the additional adequate protection provided to GPAC as set forth in prior cash collateral orders entered by this Court and as set forth below, provides GPAC with adequate protection for the Debtor's development of 750 acres of the Mock Farm, his farming corn on that acreage, and his acquisition of up to 9,000 head of wheat pasture cattle and 2,000 head of cattle for pasture on grass, and his care and maintenance of those cattle. The adequate protection as set forth in prior cash collateral orders entered by this Court includes an acknowledgement of the amount of indebtedness owed to GPAC and of its lien position, replacement liens, periodic cash payments in the amount of interest accrual, price protection on the cattle and corn to limit market risks, operating within a budget to control expenses, reporting requirements and access for inspections to enable GPAC to monitor compliance, insurance, and various default provisions.

The Court will require adequate protection of GPAC's interest in cash collateral, as a requirement for the Debtor's use of cash collateral to develop and farm the Mock Farm and to acquire and raise wheat pasture cattle and cattle on grass, as follows:

1. Before expending any funds to develop the Mock Farm, the Debtor must have written bids from vendors for the purchase and installation of irrigation pumps and sprinklers, for the purchase of gear drives, for the purchase of PVC, and to rebuild caterpillar motors and equipment, and a written estimate of the cost to install gas lines to sprinklers and electric lines to wells that supports use of $800,000 or less to complete the development of 750 acres of the Mock Farm in time to plant a spring 2011 corn crop on that land, and provide copies of those bids and written estimate to counsel for GPAC and counsel for the UCC. In addition, before

expending any funds to develop the Mock Farm, the Debtor must have received written assurances from his gas and electric providers that they expect that the gas lines and electric lines can be installed in time to plant and irrigate the 2011 corn crop, and provide copies of the same to counsel for GPAC and counsel for the UCC.

2. The Debtor will be required to forward contract his 2011 corn crop consistent with the requirements in prior cash collateral orders entered by this Court applicable to the 2010 corn crop, including requirements relating to the percentage of the expected yield to be contracted, the time frame for forward contracting and the delivery dates.

3. The Debtor will be required to forward contract or otherwise hedge cattle acquired in the first half of 2011 consistent with the requirements in prior cash collateral orders entered by this Court applicable to cattle acquired in 2010, including requirements relating to the percentage of cattle to be forward contracted or otherwise hedged, the time frame for forward contracting or hedging, and the delivery dates.

4. The Debtor will be required to sell the cattle acquired in the first half of 2011 as feeder cattle no later than June 30, 2011, or such other date the Court may fix on the consent of the Debtor, GPAC and the UCC, or after notice and a hearing, and the Debtor may not feed those cattle in a feed yard.

5. The Debtor will be authorized to use cash collateral for the usual, customary, and ordinary cost of the inputs, care, and cultivation of his 2011 wheat (or wheat blend) crop, subject to the budget and limitations set forth on Exhibit A to the Supplemental Motion and any budgets attached to prior cash collateral orders relating to that crop.

6. The Debtor will be authorized to use cash collateral for the care, feeding, maintenance, insurance, risk management, and health needs of the livestock subject to the budget and limitations set forth on Exhibit A to the Supplemental Motion.

7. The Debtor will be required to exercise prudent ranch and grazing management practices so as not to over-graze the wheat pasture.

8. Use of cash collateral as described above will be subject to and conditioned upon the same terms, conditions and forms of reporting and adequate protection (including periodic cash payments as set forth in paragraph 12.ii of the Fifth CCO) and as otherwise provided in the Fourth CCO, the Fifth CCO, the Wheat CCO, and the Wheat Pasture Cattle CCO, each of which will remain in full force and effect except as modified by Seventh Cash Collateral that will be entered in accordance with this opinion.

## CONCLUSION

Based on the foregoing, the Court concludes that the Supplemental CC Motion should be granted subject to the adequate protection and additional conditions outlined above. Subject to those conditions, GPAC's interest in cash collateral is adequately protected. Further, planting the 2011 corn crop on existing farmland, purchasing up to 9,000 head of cattle to graze on wheat and grass pasture in 2011 and developing the Mock Farm to plant a corn crop in 2011 on 750 acres falls within the Debtor's sound business judgment and does not impermissibly interfere with the pending competing plans. An order consistent with this Memorandum Opinion will be entered.

_____
ROBERT H. JACOBVITZ
Date entered on docket: February 8, 2011        United States Bankruptcy Judge

-18-

COPY TO:

**George M. Moore**
Moore, Berkson & Gandarilla, P.C.
Attorney for Debtor
PO Box 7459
Albuquerque, NM 87194

**Michael K Daniels**
Attorney for 7-H Feeders Inc.
PO Box 1640
Albuquerque, NM 87103-1640

**Jennie D Behles**
Attorney for Unsecured Creditors Committee
PO Box 7070
Albuquerque, NM 87194-7070

**Roger S Cox**
Underwood Law Firm
Attorney for Great Plains Ag Credit PCA
PO Box 9158
Amarillo, TX 79105

**James A Askew**
Arland & Associates, LLC
Attorney for Great Plains Ag Credit PCA
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

**Karla K. Poe**
Arland & Associates, LLC
Attorneys for Dalhart Consumers Fuel Association, Inc.
201 Third Street NW, Suite 505
Albuquerque, NM 87102

**Gilbert Houston Frith**
Attorney for Gene Atchley
100 N. Guadalupe St., Ste A
Santa Fe, NM 87501-2039

**United States Trustee**
PO Box 608
Albuquerque, NM 87103